**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                                                       **No. 4:23-cr-00071**

**SHELDRICK BROWN**

<u>**OPINION AND ORDER**</u>

This matter is before the Court on Defendant Sheldrick Brown's Motion to Dismiss Indictment (ECF No. 43). Defendant Brown is charged with a single count of possessing a firearm after previously being convicted as a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (ECF No. 1). He now seeks dismissal of the indictment under Federal Rule of Criminal Procedure 12 and *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). Mr. Brown contends that under *Bruen* and Fifth Circuit progeny *United States v. Rahimi*, 59 F.4th 443 (5th Cir. 2023) and *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), the felon dispossession statute, 18 U.S.C. § 922(g)(1), is unconstitutional as applied to him. The United States has responded in opposition to the motion (ECF No. 44). This is the decision of the Court.

**BACKGROUND**

The United States describes the events underlying the indictment as follows. On February 3, 2023, the Police Department of Greenville, Mississippi, "responded to a call concerning a male subject [Mr. Brown] wearing a red hoodie and khaki pants who was pointing a firearm at civilians." (ECF No. 44, PageID.297). Officers hurried to the scene and attempted to communicate with Mr. Brown, but he "fled on foot into the Double Quick convenience store." *Id.* The record does not reveal how long Mr. Brown remained in the store or whether he made any purchases before departing. As Mr. Brown exited the store, officers identified him as Sheldrick Brown, who had "two active felony warrants at the time." *Id.* The officers soon "determined that Brown had entered

1

the store and walked down the potato chip aisle, where he had stashed a 9mm pistol behind bags of Frito's [sic]." *Id.* Security camera footage from the store "confirmed that Brown had walked down the potato chip aisle and hidden a firearm." *Id.*

The indictment charges that "[o]n or about February 3, 2023, in the Northern District of Mississippi," Mr. Brown, "knowing that he had previously been convicted in a court of a felony . . . knowingly possessed a firearm, namely, a Taurus, model G2S, 9mm handgun, in and affecting interstate commerce, in violation of [18 U.S.C. §§ 922(g)(1) and 924(a)(8)]." (ECF No. 1).[1] Mr. Brown seeks dismissal of the indictment, arguing that under the *Bruen* decision, the felon dispossession statute as applied to him violates the Second Amendment.

## LEGAL STANDARDS

Federal Rule of Criminal Procedure 12(1) permits a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Mr. Brown's motion to dismiss does not require the resolution of any factual dispute, and so the Court is authorized to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005).

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The felon dispossession statute, 18 U.S.C. § 922(g)(1), provides that it is "unlawful for any person[] who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate commerce."

---

[1] The government states that Mr. Brown has one or more previous felony convictions, including a conviction for possession of cocaine and two separate convictions for aggravated assault. (ECF No. 44, PageID.297). Defendant has not challenged the statement or otherwise disputed that Mr. Brown has at least one underlying felony conviction.

In 2008, the Supreme Court determined that the Second Amendment guarantees individuals the right to keep and bear arms in their homes for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 603 (2008). Two years later, the Supreme Court ruled that the Second Amendment's guarantees apply to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). While recognizing the right of individual Americans to keep and bear arms, *Heller* also observed that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. The Court emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* In *McDonald*, the Court reiterated that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626).

In the years following *Heller* and *McDonald*, Courts of Appeals "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 597 U.S. at 17. In *Bruen*, the Supreme Court rejected this two-step approach and revisited the scope of Second Amendment rights. *Bruen* "hold[s], consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 597 U.S. at 10. *Bruen* further holds, "[i]n keeping with *Heller*, . . . that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Under *Bruen*, to overcome the presumption of constitutional protection, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). The familiar means-end scrutiny no longer applies to the analysis of Second Amendment claims. *Id.* at 19. "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* In eliminating means-end scrutiny from the Second Amendment context, *Bruen* implicitly rejects limiting principles such as federalism and respect for legislative judgments.[2]

In the wake of *Bruen*, a circuit split on the constitutionality of the felon dispossession statute has rapidly emerged. *Compare United States v. Jackson*, 69 F.4th 495, 501-05 (8th Cir. 2023) (upholding constitutionality of § 922(g)(1) as applied to defendant previously convicted of state law felonies for drug offenses), *with Range v. Att'y Gen. United States*, 69 F.4th 96, 100-01 (3rd Cir. 2023) (en banc) (finding § 922(g)(1) unconstitutional as applied to individual with prior conviction for misdemeanor food stamp fraud punishable by imprisonment for up to five years). To date, neither the Supreme Court nor the Fifth Circuit has applied the analysis *Bruen* demands to determine the constitutionality of § 922(g)(1). The Fifth Circuit has explicitly acknowledged that "the constitutionality of 922(g)(1) after *Bruen* is far from settled and there is no controlling authority." *United States v. EtchisonBrown*, No. 22-10892, 2023 WL 7381451, at *3 (5th Cir. Nov. 7, 2023).

The Supreme Court recently heard oral argument in a case arising out of the Fifth Circuit, *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023). *Rahimi* centers on a challenge to the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits the possession of firearms by someone subject to a domestic violence restraining order. The *Rahimi*

---

[2] See J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 311-22 (2009), for a discussion of *Heller's* rejection of such limiting principles.

case offers the Supreme Court an opportunity to clarify *Bruen* and provide much-needed guidance to lower courts. The Fifth Circuit has held in abeyance pending a Supreme Court decision in *Rahimi* one or more appeals squarely presenting the issue of whether section 922(g)(1) is constitutionally overbroad after *Bruen*. *See United States v. Collette*, No. 22-51062, ECF No. 57 (5th Cir. August 16, 2023).

## DISCUSSION

Mr. Brown has not sought a stay, and the Court is reluctant to stay the case of a custodial defendant without a motion to do so. Absent a decision from the Supreme Court or the Fifth Circuit that requires otherwise, the Court believes that it remains bound by the existing Fifth Circuit precedent upholding the constitutionality of 18 U.S.C. § 922(g). *See, e.g.*, *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (*aff'g United States v. Darrington*, 351 F.3d 632, 633-34 (5th Cir. 2003); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). The Fifth Circuit has observed that "[i]t is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). "Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." *Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) (citation omitted). "[F]or a Supreme Court decision to override a Fifth Circuit case, the decision must unequivocally overrule prior precedent; mere illumination of a case is insufficient." *United States v. Petras*, 879 F.3d 155, 164 (5th Cir. 2018) (citation omitted).

The Court is not persuaded that *Bruen* amounts to a change in the law that invalidates Fifth Circuit precedent upholding the constitutionality of the felon dispossession statute. *Bruen* leaves

5

the question open.[3] The Fifth Circuit implicitly recognized this in its decision awaiting further guidance from a decision in *Rahimi* before deciding the appeals on the issue before it. Under these circumstances, the Court believes it must continue to follow the law as it exists and allow the appeals process to run its course. Accordingly, Mr. Brown's motion must be denied.

A *Bruen* analysis leads this Court to the same result and highlights some of the challenges *Bruen* presents for trial courts. Under *Bruen*, the Court proceeds in two steps, asking first whether the plain text of the Second Amendment covers Mr. Brown's conduct, the possession of a firearm. *Bruen*, 597 U.S. at 17. The Court finds that it does. The felon dispossession statute deals with the keeping and bearing of arms. The Second Amendment provides that the right to keep and bear arms is held by "the people." U.S. Const. amend. II. In considering whether the Second Amendment encompasses the possession of a firearm by a felon, courts have taken two different paths that generally lead to the same result. Some courts have opined that felons are not "law-abiding citizens" and are categorically excluded from "the people" to whom the Second Amendment refers. Under this line of thought, the Second Amendment right to keep and bear arms simply does not apply to felons. *See, e.g., United States v. Hill*, No. 4:22-cr-00249, 2022 WL 17069855 (S.D. Tex. Nov. 17, 2022). Other courts have found that felons remain members of "the people" who possess the Second Amendment right to keep and bear arms. Those courts turn to the question of under what circumstances the government may restrict that right. *See, e.g., Range*, 69 F.4th at 101-02; *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting). This Court takes the latter approach. In the Court's view, the phrase "the people" "unambiguously refers

---

[3] In his concurrence, Justice Alito emphasized that *Bruen's* holding has not "disturbed anything we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 597 U.S. at 72 (Alito, J., concurring) (citations omitted). Justice Kavanaugh's concurrence, which Chief Justice Roberts joined, similarly emphasizes that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 81 (Kavanaugh, J., concurring). Justice Breyer's dissent, joined by Justices Sotomayor and Kagan, also underscores that *Bruen* "cast[s] no doubt" on *Heller's* declaration that felon-in-possession statutes are "presumptively lawful." *Id.* at 129 (Breyer, J., dissenting).

to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. The Second Amendment right to bear arms "is exercised individually and belongs to all Americans." *Id.* at 581. That includes Mr. Brown. The question is under what circumstances the government may restrict that right.

> Under *Bruen*, the Court must look to "historical tradition" to answer the question:
>
> In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing the problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.

*Bruen*, 597 at 26. *Bruen* acknowledges that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. . . . Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 27-28. To illustrate, *Bruen* quotes *Heller*: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (quoting *Heller*, 554 U.S. at 582).

In this Court's view, "historical tradition" is an unwieldy analytical tool. As Judge Reeves stated in *United States v. Bullock*,

> In this case, no historian has expressed an opinion regarding the history of felon disarmament. Neither the government nor [the defendant] submitted an expert report on the historical analogues to modern felon-in-possession laws, if any. No interested organization or member of the academy filed an amicus brief. All we have are appellate judges' interpretations of the historical record. And (some of) those interpretations are credibly accused by actual historians as being a "cherry-picked" "ideological fantasy."

*Bullock*, No. 3:18-cr-00165, 2023 WL 4232309, at *4 (S.D. Miss. June 28, 2023). Moreover, the "historical tradition" standard "has no accepted rules for what counts as evidence." *Id.* at *25.

7

*Bruen* fails to define the time frame of the governing "historical tradition,"[4] and the substance of the "historical tradition" itself is in genuine dispute. The Supreme Court's leading Second Amendment decisions reflect well-informed disagreement about the fair import of history based on thoughtful interpretation of the historical record. For example, in *Heller*, the majority "undertook 40 pages of textual and historical analysis and concluded that the Second Amendment's protection of the right to 'keep and bear Arms' historically encompassed an 'individual right to possess and carry weapons in cases of confrontation' – that is, for self-defense." *Bruen*, 597 U.S. at 108 (Breyer, J., dissenting) (quoting *Heller*, 554 U.S. at 592). Dissenting in *Heller*, Justice Stevens "conducted an equally searching textual and historical inquiry and concluded, to the contrary, that the term 'bear Arms' was an idiom that protected only the right 'to use and possess arms in conjunction with service in a well-regulated militia.'" *Id.* (quoting *Heller*, 554 U.S. at 651 (Stevens, J., dissenting)). In *Heller*, the Court "attempted to determine the scope of the Second Amendment right to bear arms by conducting a historical analysis, and some of [them] arrived at very different conclusions based on the same historical sources." *Id.* at 110. That disconnect undercuts the credibility of the prevailing interpretation.

Historical debate has continued even after the *Heller* decision, as scholars continue to voice competing positions. Justice Breyer notes that in *McDonald*, "English and early American historians (including experts at top universities) told us . . . that the *Heller* Court had gotten the

---

[4] In her concurrence in *Bruen*, Justice Barrett "highlight[s] two methodological points that the Court does not resolve." *Bruen*, 597 U.S. at 81 (Barrett, J., concurring).

> First, the Court does not conclusively determine the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution. . . . Second and relatedly, the Court avoids another "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791.

*Id.* at 81-82. She emphasizes that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 83.

history wrong" by misreading Blackstone and other sources explaining the English Bill of Rights. *Id.* at 108-09. "Other scholars have continued to write books and articles arguing that the Court's decision in *Heller* misread the text and history of the Second Amendment." *Id.* at 110 (citing numerous examples). The same historical sources may reasonably lead experts to conflicting conclusions. *Id.* "[H]istory, as much as any other interpretive method, leaves ample discretion to loo[k] over the heads of the [crowd] for one's friends.'" *Id.* at 113 (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 377 (2012)). *Bruen* itself reflects the subjective nature of historical interpretation, as the majority and those in dissent reviewed a shared historical record to reach incongruent conclusions. *See id.* at 37-70; 114-29.[5] One might conclude that "historical tradition" is a moving target.

Though skeptical of the use of "historical tradition" as a stand-alone analytical device, the Court recognizes that under *Bruen,* it must determine the constitutionality of the felon dispossession statute as applied to Mr. Brown by discerning the degree to which the statute comports with historical tradition. The felon dispossession statute originated in 1938, when Congress passed the Federal Firearms Act, prohibiting certain felons convicted of violent offenses from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (citations omitted). In 1961, Congress expanded the scope of the statute to encompass "*all* felons." *Id.* (emphasis in original). The government has identified no direct analogue from the founding era, but close parallels exist. Courts have found ample support in the historical record for at least some restrictions on gun ownership by felons. In *Kanter*, then-Judge Barrett conducted a careful and

---

[5]As Wilkinson observed, "While *Heller* [and, by extension, *Bruen*] can be hailed as a triumph of originalism, it can just as easily be seen as the opposite – an expose of original intent as a theory no less subject to judicial subjectivity and endless argumentation as any other." Wilkinson, *supra* note 2, at 256. It remains for the reader to ponder why "historical tradition" should trump either common sense or the power of local governments to rationally decide the parameters and limits of guns in the streets.

searching analysis and determined that "[f]ounding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). "In 1791 – and for well more than a century afterward – legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety." *Id.* Founding-era sources establish that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Id.* at 454. This is "a category simultaneously broader and narrower than 'felons' – it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness." *Id.*[6]

This Court notes that in each of *Heller*, *McDonald*, and *Bruen*, the Supreme Court carefully considered the historical record and left undisturbed "longstanding prohibitions on the possession of firearms and the mentally ill." *McDonald*, 561 U.S. at 786. For the purpose of its decision in this case, the Court relies on the historical accounts the Supreme Court has already provided and concludes that the felon dispossession statute comports with "historical tradition." Accordingly, the Court finds the statute constitutional as applied to Mr. Brown.

## CONCLUSION

For these reasons, the Court concludes that Mr. Brown is not entitled to the relief he seeks.

**ACCORDINGLY, IT IS ORDERED** that Defendant Brown's Motion to Dismiss Indictment (ECF No. 43) is **DENIED**.

**SO ORDERED** this the 20th day of December, 2023.

/s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**

---

[6] It should not be missed that then-Judge Barrett's analysis presumes a certain regard for the acts of the various state and local governments who are dealing with real issues of crime and punishment, not shifting interpretations after the fact.